FREDERIC W. STEVENS, EUGENE STEVENSON, EDMUND B. LEAM-
ING, VIVIAN M. LEWIS, JOHN H. BACKES, JOHN GRIFFIN,
JOHN E. FOSTER ,AND MERRITT LANE, VICE-
CHANCELLORS.

FRANKLIN BANKS

*v.*

WILLIAM SIMPKINS.

[Decided December 20th, 1917.]

1. The right of a lower owner to dam and back water up on an upper owner can only be acquired by grant or prescription.

2. To show that flooding bogs at various times is a custom in the husbandry of cranberries in an action. involving the right to dam up .waters, it is not necessary to show that such usage is immemorial.

1

3. Because a cranberry grower keeps a gateway in a natural water course closed, and uses an artificial drain in ordinary times, this does not require him to keep such gate closed in a freshet, where the lower owner has acquired no right by prescription or grant to require it to be kept closed at such a time.

4. In this case the evidence shows that a reservoir of an ancient or natural water course was an obstruction causing the backing up and flooding of an upper cranberry bog.

5. An answer to a suit to enjoin the maintenance of a reservoir by a lower landowner, although denying that the reservoir caused water to back up on the complainant's land, *held* to admit facts which bring the case within the rule that courts of equity have jurisdiction of such cases where the legal right, though disputed, is clear on facts which are not denied and legal rules which are well settled.

On final hearing on pleadings and proofs.

*Mr. Jonathan H. Kelsey,* for the complainant.

*Mr. Harold B. Wells,* for the defendant.

WALKER, CHANCELLOR.

The bill alleges that the complainant is the owner of a tract of fifty-seven acres of land in the county of Burlington, which is largely under the cultivation of cranberries, and that a stream of water flows through the tract and cranberry bog; that the defendant is the owner of a large tract of land adjoining that of the complainant, and that the defendant's land is on the stream of water and below the land of the complainant, and that the natural course of the stream running through the complainant's land is toward and through the tract of land and cranberry bog of the defendant; that the defendant maintains a reservoir below and adjoining the tract of the complainant, which reservoir consists of a large area of land enclosing the water course and basin of the stream by large banks, and that the banks or dams have flood-gates or sluiceways for holding and discharging water; that the reservoir of defendant completely blocks the water that flows through the stream in complainant's bog; that the complainant can only drain his bog by a ditch from the stream flowing in another direction, and, by so doing, diverting the water from its natural course; that the complainant has no way of

draining his land or bog except by diverting waters from the natural course of the stream, and is unable to sufficiently drain his land and bog by reason of the defendant's maintenance of his reservoir with a large body of water below complainant's land, which water has backed up on the complainant's bog, overflowing the same, by reason whereof large quantities of cranberries, and the bog, have been damaged, and the complainant prevented from cleaning and cultivating his berries; that he has frequently applied to the defendant to open the sluiceway in his dam and allow the water to flow from his bog and not back up on to complainant's land by the maintenance of the reservoir, and has requested him to desist from holding the water in his reservoir to such a height that it would back up on the complainant's lands and destroy the berries, which defendant has wholly refused to do. The prayer of the bill is that the defendant may be restrained by injunction from holding a head of water in his reservoir from the 1st of May to the 1st of December in each year to such height that the complainant cannot drain his bog through the natural water course flowing through the defendant's land, and that defendant be restrained from obstructing the water course by dam, gates or otherwise during the time complainant's bog is not flooded during the seasons that bogs are necessarily to be clear of water for the growing of crops, and that the defendant be restrained from interfering with the natural water course by stoppage or otherwise, so that the complainant may have a clear water course at all times that it may be necessary for the maintenance of his cranberry bog and the growing and cultivation of fruit thereon, and for further or other relief.

The answer of the defendant admits that the complainant is the owner of the tract of land and premises described in the bill and admits that a portion thereof is under the cultivation of cranberries, and that a stream of water flows through the tract and cranberry bog; that defendant is the owner and proprietor of the tract of land and premises adjoining that of complainant, and avers that some portion of defendant's land is on the stream of water and below the land of complainant, and that the natural water course of the stream running through complainant's land flows toward and through some portions of the tract of land and

bog of the defendant, but denies that the natural water course of the stream runs through his reservoir, and says that this natural course runs from the lands of the complainant to a point opposite the sluiceway in the dam dividing the land of complainant from the reservoir of the defendant, and thence along .the southerly side of the dam dividing the land of the complainant from the reservoir and land of the defendant, in an easterly direction to the sluiceway in the dam dividing the property of complainant. from that of William H. Brown, and thence on to the property of Brown, through his sluiceways and ditches on to other lands of the defendant and to the northeast of the lands of Brown, and thence on and through the lands of Samuel F. Garrison to Deep run, and thence to Rancocas creek; that the defendant has maintained a reservoir adjoining the complainant's tract and that the reservoir consists of a large area of land, but denies that it encloses the water basin referred to in .the bill, but admits that the reservoir is enclosed by banks, and that in the banks are floodgates or sluiceways with gates for holding and discharging water; that it is not true that his reservoir completely blocks any water that may flow through the stream in complainant's bog from the natural flow of the water, and denies that complainant can drain his bog only by a ditch from the stream flowing in another direction, and, by so doing, diverting the water from its natural course, and says that the natural course is not through defendant's reservoir; that it is not true that complainant has no way of draining his tract except by diverting the water from the natural course of the stream, and says that there are two sluiceways other than the one leading from complainant's land to defendant's reservoir, one of which is the dam dividing the lands of complainant from that of Brown, and the other is near the easterly end of the dam dividing the lands of defendant from those of the complainant, both of which sluiceways afford ample outlet for the water, sufficient to drain complainant's land and bog; that for the last thirty years only the top water has passed from the lands of the complainant to those. of the defendant through the sluiceway leading into defendant's reservoir, and that for over twenty-five years a sand or turf dam immediately in front of the sluiceway completely blocked the bottom water

*88 N. J. Eq.* Banks *v.* Simpkins.

from passing from the lands of complainant, and his predecessors in title, to the land of defendant and his predecessors in title, and that for the last ten years that sluiceway has been in existence as an auxiliary dam to the sand or turf dam, and the two combined have prevented anything but the top water from passing from the lands of complainant into the reservoir of defendant, and that the boards in that sluiceway have always been kept in, and that the sand or turf dam was removed by complainant in the month of July, 1915, but that the sluiceway still effectually prevents anything but the top water from passing from the lands of the complainant to the reservoir of defendant, the bottom water still passing, as it has passed for over thirty years, along the southerly side of the dam dividing the lands of complainant from lands of defendant to and through the Brown sluiceway, &c.; that it is not true that by defendant's maintenance of his reservoir with a large body of water below that of complainant's land the water has backed up on complainant's cranberry bog, overflowing the same, and by reason thereof has rotted large quantities of cranberries and damaged the bog and prevented the complainant from cleaning and cultivating the berries; that complainant has not frequently applied to defendant to open the sluiceways and allow the water to flow from complainant's bog and not back the water on complainant's land by maintaining the reservoir, and to desist from holding the water in the reservoir to such a height that it would back on to complainant's land and destroy his fruit, and says that only on one occasion did complainant ask defendant to open the sluiceways in his dam, and that was during a long and severe storm in which unprecedented quantities of water fell upon the earth, by reason of which many bogs in the vicinity were inundated, and during which and for a short time thereafter the bog of complainant was covered with water due to his neglect in the regulation of his gates or sluiceways in the dam dividing the property of complainant from that of Brown, and also the gates or sluiceways near the easterly end of the dam dividing the lands of complainant from those of defendant; defendant admits that on this occasion complainant asked him to remove the lower gates in his reservoir, with which request he refused to comply, for the reason

that it would not have helped to remove the volume of water from the lands of complainant and would have damaged the defendant's bog by overflowing the same with water then held in defendant's reservoir, none of which was at that time backing up on to the lands of complainant, nor has the water ever backed up from defendant's reservoir to and upon the lands of complainant.

In *Defiance Fruit Co.* v. *Fox, 72 N. J. Eq. 297,* Vice-Chancellor Leaming decided that the overflowing of a cranberry bog by back water was a purely legal question and of his own motion refused to try that issue in the case and relegated the complainant to a suit at law, retaining the bill *ad interim.* In *S. C., 76 N. J. Eq. 147,* after verdict for defendant in the action at law, and another similar action brought, defendant filed a cross-bill, to the end that this court should make a decree determining the level to which the water in a certain mill pond could be lawfully maintained, and the defendants answered and joined in the prayer of the cross-bill.

The original bill in *Defiance Fruit Co.* v. *Fox* was retained pending action at law because of the absence of the denial of equity jurisdiction by the defendant. In the second suit of *Defiance Fruit Co.* v. *Fox* the vice-chancellor, after hearing, decided the height to which defendant had obtained a prescriptive right to raise the water in the stream in question by means of a certain dam. And in the case at bar both parties have submitted for my determination the issue raised by the bill and answer. The question thus presented has been submitted on affidavits served and replied to, as on final hearing, and, at my suggestion and by consent of the parties, I have viewed the premises in question. It is pertinent to observe that in the *Defiance Fruit Company Case* the defendant asserted a prescriptive right to maintain a dam at a certain height. Not so in the case at bar. Here no right by prescription is set out. On the contrary, it is conceded that defendant's dam has only existed fifteen years. This case I deem to be entirely within the jurisdiction of this court, as will hereinafter be made to appear.

The testimony is conflicting and perplexing. It is significant, however, that the defendant in one of his affidavits says that

owing to a scarcity of water it became necessary for him, some fifteen years before the filing of complainant's bill, to construct a reservoir, which he did at considerable expense, and that the reservoir is on a piece of swamp land, at the northerly and easterly ends of which are dams in which are sluiceways or gates, and that his bog adjoins that of the complainant and that they are separated by a dam, near the westerly end of which is a sluiceway. It is true that the defendant avers and testifies that this sluiceway has been closed for over twenty years, and that the only water he receives for his reservoir through this sluiceway is the top water and such as soaks through the gates, and also that there has existed for over twenty-five years in front of the complainant's sluiceway a sand or turf dam which was removed by the complainant in July, 1915, and that for over ten years the present wooden sluiceway has been in existence, and that the turf dam alone completely prevented the water from flowing from complainant's bog to defendant's reservoir, and that the present sluiceway was an additional and auxiliary barrier. But it is not perceived that these facts, assuming them to be true, give the defendant any right to maintain a reservoir, below complainant's lands, which would raise the height of the water in the natural stream, thereby raising its level as it flows through the land and bog of the complainant in times when it is necessary for the complainant to have the water flow at its natural level instead of backing up and overflowing his bog by reason of the existence of the reservoir below and any unnatural height of water maintained in it. Such a right could only be acquired by grant or prescription. No grant was pleaded or proof offered to show that the prescriptive period of twenty years of uninterrupted exercise of the alleged right has accrued.

It may well be that the defendant would have a right to demand that the natural flow of the stream through complainant's land should be uninterrupted, so that he, the defendant, could enjoy all of the natural flowage of the stream instead of only the top water running over the boards in complainant's sluiceway, were it not for the fact that the complainant appears to have acquired a prescriptive right to so control the water in the

stream. And this by the defendant's own showing. However, this question is not in the case.

The defendant also testifies that his cranberry bog without the use of the reservoir would be worth a much less sum than it is, as the reservoir is the only means which he has of protecting his bog.

On the argument before me it was stated and conceded that the cultivation of cranberries is a specialized business. That an acre of cranberry vines in good state of cultivation, with proper and necessary dams, ditches, reservoirs and water-supply, is worth, approximately, $1,000, but when such ground is not properly taken care of, and without proper ditches, reservoirs, dams and water-supply, it is of little value, probably about $50 per acre. That to a cranberry grower the land or bottom is divided into two classes, namely, the swamp bottom, which is of muck or peaty nature, and is almost invariably traversed by a stream of water, and land that sheds the water toward the swamp proper, and which is only very occasionally flooded by freshets, which bottom is made up of a mixture of sand and decayed matter, and is called "Savannah" ground. All other land is what is called "outland," being the high land, composed principally of sand, and is of little or no value for cranberry cultivation.

The swamp bottom and Savannah ground is that used for cranberry cultivation, and in its wild or natural state is covered with trees and undergrowth. The person who proposes to change such land into a cranberry bog, invariably must build dikes or dams across the swamp or slope of the ground and catch the water and hold it on the ground until all such undergrowth is killed, which takes about two years. Then the water is drawn off and the ground is properly ditched and then burned over. After the burning, the ground is cleared of such rubbish as may remain and then graded. After this the vines are set out in rows about one foot apart—a small bunch of vines in each hill or place. After setting out the vines they come into bearing after four or five years, and a full crop is not procured until approximately eight years after the vines are planted. Thus, practically ten years are consumed in placing a property on a paying basis.

After the cranberry vines come into bearing they are seriously affected by frosts, floods, draughts, insect pests, severe hot weather and different kinds of noxious growths, most of which can be dealt with properly by flowing the bogs at the proper time of year and for the required length of time. The growing season for cranberries is from about the 1st of May to about the 1st of October, during which time the bogs are not flooded, except for short periods only. The winter flood is usually put on about the 1st of December, but sometimes earlier, and kept on until some time in April. During this later period the vines should be completely covered with water, the principal reason being to prevent them from being winter killed, as it is called, and to prevent the too early starting of growth in the spring. The cranberries are harvested during the month of September and the early part of October. If a frost occurs during the growing, it will kill the bloom during the early part of the period and ruin the berries during the later part, and thereby make them worthless. One night of frost is often sufficient to completely ruin a crop of berries for the year. The only practical method known to the industry to save a crop from frost is by covering the vines with water, which is an effective shield.

If a grower has no reservoir wherein to store water, it becomes impossible for him to flood within the time required to prevent blighting by frost, if there are no streams flowing through the bogs sufficiently large to flood the necessary acreage within the few hours required. Frosts occur during the months of May and June, sometimes as late as the 15th of June, and then again in the fall, from the 1st of September until the crop is entirely harvested. The harvesting is usually complete by the 15th to the 20th of October. A heavy frost on one night can, and has, destroyed entire crops of berries.

Insect pests must also be guarded against. The "fire worms" can, and do, often within a few days ruin entire crops. These worms work during the mid-blooming and growing seasons. They can be controlled only by water. Such flowing must be done very quickly, and the water held on the vines only sufficiently long to do the work required, and then must be drawn off as quickly as possible. The "girdle worms" work toward the

latter part of the growing season, and to control them the vines must be flowed immediately after the berries are picked.

In order to flood cranberry bogs they must be surrounded by dams of proper size so that the water can be impounded where needed. Proper sluiceways must also be built in such dams for the venting of the water that may be in streams, or that may accumulate from rainfall.

This description of the custom of husbandry in this particular kind of agriculture—that is, the cultivation of cranberries, is interesting. It is not shown how long this custom has existed, but it would appear that it is not necessary that such usage should be immemorial. *Barton* v. *McKelway, 22 N. J. Law 165, 175.* See, also, *Runyan* v. *Central Railroad Co., 64 N. J. Law 68, 78.*

Both these parties are cranberry growers on lands adjoining one another. Each must, in the nature of things, maintain dams, and may maintain reservoirs with sluicegates, &c.; but this does not permit of either one so controlling the water on his premises that it may operate to the detriment of the other, unless a right to such control resides in grant or prescription. No mere custom of husbandry could be permitted to subordinate the principles of law regulating the flowage of water in natural streams, unless, of course, a party acquired such a right by grant or prescription, or succeeded to such right, already acquired, by descent or conveyance.

Three maps were offered in evidence—two made by James Logan, civil engineer, for complainant, and one by Henry S. Haines, civil engineer, for defendant. The first Logan map was made November 16th, 1915, and is a sort of skeleton or outline map. The other one was made in June, 1917, and contains many levels. In the Logan map of November, 1915, in the dividing line between the premises of the complainant and defendant, is shown a sluiceway in the dam, marked A. On the defendant's land, and at two certain points in the bank of his reservoir, are sluiceways marked B and C. Logan testified that point A is the elevation of the ground on the northwest side of Banks' dam; point B, the elevation of the ground on the south side of Simpkins' dam, near the gate on the west, and point C, the elevation

of the ground near the other gate of the same dam; that the difference in elevation between A and B is one foot eleven and three-quarter inches, A having the higher elevation, showing flow from A to B; that the difference in elevation between A and C is one foot six and three-eighths inches. A having the higher elevation, showing a flow from A to C. Logan further testified that the reservoir of Simpkins shown on the map covers a natural water course from Banks' dam to the dam of Simpkins; that his reason for stating that the flow of water is from Banks' to Simpkins' is the result of a survey which he made.

The Haines map shows the sluiceways A, B and C, the same as on the Logan map. Mr. Haines says that ninety-nine and ninety-eight hundredths represents the elevation of water on the Simpkins' side of the sluiceway, marked A, and that ninety-nine and fifty-seven hundredths represents the elevation of water on the Banks' side of the same sluiceway, showing the water on the Banks' side to be forty-one hundredths of a foot, or nearly five inches lower than on the Simpkins' side of the same sluiceway. He further says that the field book which he had with him when testifying did not give the levels found by him at point B; that there is a decided slope in the land along which the stream of water runs from A to D, E to F to G to H to Deep run, on his map, which course runs in a northeast direction, generally speaking, and empties into Rancocas creek. Logan's map shows the elevation at point A on Banks' side to be ninety-eight and eighty-five hundredths, and on Simpkins' side to be ninety-eight and eighty-eight hundredths. The engineers are thus in agreement to the effect that the water was slightly higher on the Simpkins' side of the dam when their maps were made. But this, it seems to me, is quite immaterial, because the dam, between the two properties, would enable either owner to maintain a greater head of water on his property than the other at will.

George Reilly, seventy years old, testified for the complainant that he resided in Burlington county, near the bogs in question, for about twenty-six years, and at one time owned the Banks' land and is well acquainted with his bog and the reservoir of Simpkins adjoining, the general contour of the land and the natural flow of the waters that rise in the land of Theodore

Budd, flowing thence through the Clevenger bog; thence through the lands and bogs of Burr; thence to the adjoining lands of Banks to that of Simpkins. He remembers when the Banks' tract was cleared and set out in cranberry vines and when the dams were built, which was about forty years ago, and at that time all of the water flowed from the Banks' property down through a natural water course to the Simpkins' property, and has continued to flow from that time up to the present in the same course and direction through the property of Simpkins. He remembers that Simpkins bought his property about fifteen or sixteen years ago, at which time there was no reservoir on it, which was a natural swamp, with no dams surrounding it. The reservoir and dams of Simpkins have been erected and maintained since he purchased the property; that the dams consist of turf walls of sufficient thickness and height to retain large bodies of water; that in those dams are gates or sluiceways so constructed that the water can be held in the reservoir at such height as to back water over a considerable part of Banks' bog and through it on to the land of Burr; that there is no other natural water course by which Banks can drain his bog except through Simpkins' tract; that if Simpkins maintains a head of water in his reservoir it blocks the natural water course so that the water is backed upon the lands and bog of Banks.

Victor Bush, another witness for complainant, testified that he is forty-nine years old, and has lived in Burlington county all his life; that he was with Messrs. Shreve, Lemon, Burr, Banks and others at the bog of Banks the first part of August, 1915, and was there a few days before, when the bog was covered with water, when a boat could have been rowed anywhere over the Banks' bog; that the reservoir of Simpkins was full of water, it being eighteen inches higher than the water in Banks' bog. He saw the condition of the cranberries on the vines in Banks' bog; that over the parts that had been flooded about ninety per cent. were rotted and decayed, and this was due to the water backed up from the stoppage by Simpkins' reservoir. Witness said he remembered Banks' bog when his (witness') father owned it about thirty-five years ago, at which time there was no reservoir and there was no auxiliary ditch which led into Brown's land;

that there is a knoll through which this auxiliary ditch has been cut into Brown's land, and that he himself was concerned in cutting the top off the knoll and putting in a little trough which was used as a tumbling dam, so that when the water reached a certain height it would automatically run over the tumbling dam; he remembered when Simpkins purchased his land and there was no reservoir there at that time and the bog now of Banks was drained through the Simpkins' land, which was then a swamp; that Simpkins constructed his reservoir about fifteen years ago; that the auxiliary ditch was a narrow one, not situated at the lowest point of the bog and can only be used to drain excess water of a limited amount, and that to properly drain Banks' bog it is necessary that the natural water course running through Simpkins' land should be clear and unobstructed.

J. Howard Burr, Thomas C. Shreve, Grant Joyclin, Charles Carpenter, William H. Brown, Franklin Butterworth and Franklin Banks, the complainant, testified generally to the same state of facts as those just detailed.

The defendant, William Simpkins, besides testifying as above stated, said that his entire life has been spent in the development of cranberry bogs; that he gets the water in his reservoir from the lands of Andrew Fort, lying to the west, and holds the water in the reservoir at certain seasons of the year in order that he may distribute it throughout the ditches on to the various bogs owned by him to protect them against the winter and for the extermination of insects when occasion requires; that if he has no right to shut the gates in his reservoir from May 1st to November 1st, it is practically useless, and his bogs are depreciated at least three-fourths in value; that he has never backed water from his reservoir on to the bog of Banks; that there is no natural water course leading from Banks' bog through his sluiceway into defendant's reservoir, and thence through it to the lands of Butterworth, Reilly and Bills; that the natural water course for over forty years has been from Burr's bog to Banks' bog, and from Banks' bog through a well-defined channel in an easterly direction along the southerly side of the Banks-Simpkins dam to a sluiceway in the dam between Banks and Brown, which dam

runs perpendicular (parallel) to the dam between Brown's and his own, and which is known as the Brown sluiceway; that this channel or ditch is wide and deep and that the slope of the land is in that (Brown's) direction.

George Haines testified for the defendant that he has resided in Pemberton township (Burlington county) for over thirty years, and has lived in the neighborhood of the bogs of Banks and Simpkins during all that time; that he has been acquainted with the stream of water running from the lands of Burr on to and over the land of Banks; that the bottom water in the stream has been running for over thirty years from the lands owned by Banks through a stream or channel to the gates or sluiceway on and over the land of Brown and thence to Deep run, emptying into Rancocas creek; that it is only the top water that passes from the lands of Banks to those of Simpkins through the sluiceway in the dam dividing the properties; that the water in the Simpkins reservoir cannot back up upon the land of Banks unless Banks removes the boards in his gates; that on all ordinary occasions and in ordinary freshets the water is readily carried from the bog of Banks through his ditch into and through the sluiceway dividing his lands from those of Brown, and on and over Brown's land to Deep run, and thence to Rancocas creek; that for over thirty years the surface water from the ditches on Banks' bog is the only water that has been conveyed through the Banks sluiceway on to the land of Simpkins, and for the last fifteen years Simpkins has caught the surface water in his reservoir and has distributed it from the reservoir to the land of Butterworth, Reilly and Bills; that the reservoir gathers the greater part of its water from the west and from the land formerly of Andrew Fort; that the general slope of the land is to the northeast, and that the lands of Fort are located to the west of Simpkins' reservoir and are higher; that the water from this reservoir cannot be made to injure the property of Banks unless he removes the boards in his sluiceway when there is a head of water in the reservoir and at the same time keeps in the boards in the Brown sluiceway and thereby draws the water in the reservoir back through his, Banks', sluiceway on to his land, and, by closing the Brown sluiceway, holding it

there; that the reservoir is needed as a protection against the frosts of May, June and September, and that the bog of Simpkins would be practically ruined if he were compelled to leave the gates of his reservoir open from May to November 1st.

Samuel E. Reilly, Allen Clevenger and Harry Knight gave testimony corroborating the claim of defendant.

The trouble between these two men, complainant and defendant, of which this suit is the outgrowth, occurred by reason of an extraordinarily severe rain storm in the first part of August, 1915. As to that occurrence complainant testifies that in the forepart of August there had been a number of heavy rains and the water overflowed the ditches in his bog and commenced to cover the vines. It got so high that he found he could drain some water through the auxiliary ditch into the bog of Brown and then removed two boards from the gates into Brown's bog. On the next day he found that the water was still rising in his bog and the one remaining board was taken out in the gates of the Brown ditch; still the water got deeper in his bog and the next day he went to the bog and did everything he could to drain it, but found the water was getting deeper and flowing over his vines, completely covering the bog and submerging the vines, except on the higher ridges; that he immediately drove over to Simpkins' house and requested him to take some of the boards off the gates (B and C on the map) and thereby allow the water to flow through the natural course of his (Simpkins') land, who, Simpkins, said he would go over and see if he could do as Banks wished; that he, Banks, afterwards returned home and went back to the bog early the next morning, August 4th, and found the water deeper than on the previous day; that Simpkins was there building a new gate (at a place marked on the map); that he again asked Simpkins if he would not take the boards off (on gates B and C) as he had promised he would; that Simpkins said he had only one board on the gate where the land was higher than at his (Banks') gate; that he, Banks, went around to see the gates (B and C) for himself and found every board on that the gates would hold, up to the top, and the water flowing over the top boards. At that time Simpkins came up to where he, Banks, was and he asked him, Simpkins, if he would

not take the boards off the gates in the dam (B and C), that it would ruin his, Banks', crop if the water much longer stayed up where it was, and that Simpkins replied that the land was his and he would do as he pleased with it; that he had held that piece of land as a reservoir for the last fifteen years and expected to continue to do so. The complainant then sought out Howard Burr to get him to induce Simpkins to take the boards off. He took Burr and Victor Bush back to the bogs. Simpkins had gone home, leaving the gates as they were. The party met Clarence Simpkins, the defendant's son, on the dams, and Burr called his attention to the water and told him the crop of his own bog would be ruined, if it was not already, and Clarence went around and took a board off each gate (at B and C). Complainant, Burr and Bush then went away, leaving Grant Joyclin to watch Clarence to see if he put back the boards. Joyclin testified that Clarence Simpkins took a board off each gate referred to, and that Banks asked him, Joyclin, to watch that the boards were not put on again, which he did, and that shortly after Banks, Burr and Bush left he heard someone hammering at the gates, and went around there and found that the boards had been replaced, and then he went around to the dam, at point A, and saw that the water had stopped flowing through the same and was backing on to Banks' bog; that when Clarence Simpkins took the boards off the gates the water was running over the top board; that he could see the water go down at once in the reservoir; that there was quite a current out of the reservoir when the boards were out and this stopped when they were put back. Complainant testified that the water continued to flood his bog until August 7th, when it commenced to go down, and on the 8th it was off the vines, but the ditches were still flowing and the berries showed signs of rot, and continued to rot on the part of his bog which had been flooded.

Defendant testified that the trouble between him and the complainant arose because of the storm which occurred in the first part of August, 1915; that it was the most severe storm he recalls, lasting for several days; that during the first two days Banks neglected his bog, and did not remove the boards in the Brown sluiceway, which was the natural outlet for his water,

nor from the sluiceway running from defendant's to Banks' bog, known as the Simpkins' sluiceway, and that the water accumulated upon the bog of Banks to such an extent as to overflow it; that when he did remove the boards in the Brown sluiceway the water went down through the regular channel as fast as it possibly could, and that no water whatever, during this severe storm, backed up from the reservoir of defendant to the land of Banks; that during all the time of the storm the boards were in the Banks' sluiceway, making it impossible for the water to back up from defendant's reservoir to the bog of Banks.

The question is as to the direction in which the water, unobstructed by the dividing dam or by the farther banks of the Simpkins' dam, flows. My inspection of the *locus in quo* demonstrated to my satisfaction that the natural flow of the water was through Banks' tract on to and through Simpkins' tract in the bed of a swamp, which contained very little water in the dry periods. My view of the premises also convinced me that the water course running along the Banks' side of the dam dividing his property from that of Simpkins, on to and through the land of Brown, was an artificial ditch or drain. This was indicated by its commencing at the sluiceway A, through which the water would naturally flow on to Simpkins' tract and running along the Banks' tract practically paralleling the dam in almost a straight line until it reached the land of Brown, with equally distant banks and of practically the same depth along its course. It appears to be a clear-cut and clearly-defined ditch or run.

Because Banks retains water in his ditches which would otherwise flow on to and through Simpkins' land were it not for the generally closed sluiceway which Banks maintains, does not enable Simpkins to compel Banks to keep his sluiceway closed in times of freshet (or other times), because Banks appears to have acquired a right by prescription to retain the water, while Simpkins has obtained no right, either by grant or prescription, to prevent Banks from draining through and over Simpkins' land.

The water rights here involved are not strictly those of upper and lower riparian owners, as such rights generally concern those of the owners of lands bounded by a stream of water in which

the owners have a qualified property in the soil to the thread of the stream, but are rather the rights of flowage of a natural stream from higher ground on to and through the land of a lower owner. Although rights of flowage obtain in strictly riparian cases also.

A case in this state much in point is that of *Earl* v. *De Hart* (*Court of Errors and Appeals, 1856*), *12 N. J. Eq. 280.* The opinion is that of Chancellor Williamson, whose decree was affirmed on his deliverance. The chancellor said (at *p. 282*) that the defendants' answer admitted that there was a considerable quantity of water requiring an outlet from the complainant's land at certain seasons of the year, and from the formation of the surface of the ground the water naturally flowed from the complainant's land across the lot of the defendants. A parallel is created in the case at bar by the defendant's averment in his answer that some portion of his land is on the stream of water and below the land of complainant, and that the natural water course of the stream running through complainant's land flows toward and through some portion of the tract and bog of the defendant. It is true that the defendant denies that the natural water course runs through his reservoir and says that it runs from (over) the lands of the complainant to a point opposite the sluiceway in the dam dividing the land of complainant from the reservoir of the defendant and thence along the southerly side of that dam to the property of Brown. But this is a virtual admission of what the fact is, namely, that the water course runs right down to the sluiceway in the dam dividing the lands of complainant and defendant, from whence, were it not for the dam when the sluiceway is closed, the water would flow on to the lands of defendant and into his reservoir. And, as already remarked, the water course turning abruptly to the right at the sluiceway and running along Banks' side of the dam on to Brown's land, is an artificial ditch, without which all the water running across complainant's land would have to flow through and over the defendant's or else be backed up on complainant's.

Speaking of the stream in question, in *Earl* v. *De Hart,* the chancellor used this language (at *p. 283*) :

"It is an ancient water course if the channel through which it naturally runs has existed from time immemorial. Whether it is entitled to be called an ancient water course, and, as such, legal rights can be acquired and lost in it, does not depend upon the quantity of water it discharges. Many ancient streams of water which, if dammed off, would inundate a large region of country, are dry for a great portion of the year. If the face of the country is such as necessarily collects in one body so large a quantity of water, after heavy rains and the melting of large bodies of snow, as to require an outlet to some common reservoir, and if such water is regularly discharged through a well-defined channel, which the force of the water has made for itself, and which is the accustomed channel through which it flows, and has flowed from time immemorial, such channel is an ancient natural water course."

In *Bailey* v. *Schnitzius, 53 N. J. Eq. 235,* Vice-Chancellor Bird applied the doctrine of *Earl* v. *De Hart,* to which case he referred as a well-considered one. In *Bailey* v. *Schnitzius* the court of errors and appeals likewise affirmed on the opinion of the vice-chancellor, which is the only one printed. *Earl* v. *De Hart* and *Bailey* v. *Schnitzius* embody the settled law of this state on this subject.

There is abundant testimony to show that the stream running across complainant's lands on to and through those of the defendant is an ancient water course, and my observation of the surface of the ground indicated that it is the kind of ancient stream, comparatively dry during a great portion of the year, such as requires an outlet after heavy rains, as mentioned by Chancellor Williamson in *Earl* v. *De Hart.* That there is an artificial ditch or waterway on Banks' land for the draining of a portion of the waters running through this ancient stream is favorable to the defendant, as otherwise all of the water running through the natural course would have to be emptied on and across the defendant's land.

In my judgment, this case, on the law and the facts, is clearly with the complainant.

The case at bar, I think, is one of those in which the court of errors and appeals, in *Hart* v. *Leonard, 42 N. J. Eq. 416,*

concedes that the court of chancery has jurisdiction without the rights of the parties having first been settled in an action at law. It comes, I think, within the third class of cases mentioned by Mr. Justice Dixon, who wrote the opinion—that is, cases where the legal right, though disputed, is clear on facts which are not denied and legal rules which are well settled, and the object of the bill is to ascertain the extent of the right and enforce and protect it in a manner not attainable by legal procedure. *Earl* v. *De Hart* is cited as one of the cases supporting this proposition. As above indicated, there are averments in the answer which, in my judgment, sufficiently admit the existence of facts which bring the case within the rule just stated. The defendant could prevail only by showing that he had held the water so high in his dam for the prescriptive period of twenty years as to affect the land of plaintiff as injuriously as it did at the time of the flood in August, 1915. See *Carlisle* v. *Cooper, 21 N. J. Eq. 576* (at *p. 595*).

The defendant must, therefore, be enjoined from holding a head of water in his reservoir from May 1st to December 1st in each year to such height that the complainant cannot drain his bog through the natural water course flowing over the defendant's land; and he must also be restrained from obstructing the water course by dam, gates or otherwise during the time complainant's bog is not flooded and during the season that bogs are necessary to be clear of water for the growing of crops, and from interfering with the natural water course, by stoppage or otherwise, so that the complainant may have a clear water course during times that may be necessary for the growing and cultivation of cranberries on his bog.

It was suggested on the argument that if an injunction issue it should not be in general terms as to height, but should determine the exact height at which defendant may maintain a head of water in his reservoir. The trouble is that the testimony before me does not with sufficient clearness indicate any such height. The case was not tried with that in view. The parties will, however, if they desire it, be permitted to take testimony on that point. It was also suggested that the defendant could

entirely remedy the situation by dividing his reservoir into two parts, so as to permit the flowage of the stream in its natural course between two reservoirs, which would require him to build two additional banks or dams. With that proposition the court is not concerned.

A decree will be made in accordance with the views above expressed. The complainant is entitled to costs.